UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES

         -v-

MATTHEW VADO,

                      Defendant.

------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/20/2015
```

14 Cr. 666 (PAE)

OPINION & ORDER

     In the early morning of June 17, 2014, FBI agents executed a search warrant at the home of Matthew Vado, who was suspected of child pornography offenses. During the search, two agents interviewed Vado for approximately 40 minutes. Vado, who was later indicted, now seeks to suppress the statements he made during that interview. He argues, on two grounds, that his Fifth Amendment rights were violated: First, he argues, the interview was a custodial interrogation, and the agents unlawfully questioned him after he had invoked his right to counsel. Second, he argues, his statements were involuntary. For the following reasons, the Court denies Vado's motion to suppress.

I. **Procedural History**

     Vado was arrested on June 17, 2014, after the search and interview at issue. Dkt. 1. On October 6, 2014, a Grand Jury returned an Indictment. It charged Vado, in 10 counts, with violating federal child pornography statutes. Dkt. 13.

     On January 6, 2015, Vado filed a motion to suppress the statements he made during the interview, Dkt. 24, along with a supporting memorandum of law, Dkt 26 ("Vado Br."), and a declaration by his counsel, Dkt. 25, which attached a sworn declaration from Vado attesting to the circumstances of the interview. *Id.*, Ex. A ("Vado Decl."). On January 9, 2015, the

Government submitted its opposition to the motion, and supporting materials. Dkt. 27 ("Gov't Br."), Dkt. 28 ("Thompson Decl."). On January 13, 2015, the Court held a suppression hearing and heard argument. *See* Transcript ("Tr.").

## II.   Factual Findings

The facts found by the Court are based on the evidence adduced at the suppression hearing.[1] The evidence consisted of the testimony of the two FBI Special Agents present for Vado's interview, Thomas Thompson and Aaron Spivack; an Advice of Rights Form signed by Vado; an FBI 302 form prepared by the agents that memorialized the interview; and Vado's sworn declaration. Vado did not testify.

The general timeline and many facts are undisputed. The most significant disputed fact is whether, before questioning Vado, the agents informed him that he was not under arrest and that he was free to leave. As explained below, the Court finds that Vado was so advised. That fact is relevant to the Court's determination that Vado was not in custody at the time of his interview; that determination, in turn, resolves whether Vado's Fifth Amendment right to counsel was violated and is important to the Court's resolution of whether his statements were voluntary.

The hearing evidence established the following:

At around 6 a.m. on June 17, 2014, between eight and 10 FBI agents arrived at Vado's apartment in Manhattan to execute a court-authorized search warrant. Tr. 6, 52, 69; Vado Decl. ¶¶ 4–5. They did not have a warrant for Vado's arrest. Tr. 6, 53. The agents knocked and announced; Vado opened the door. Tr. 6, 54; Vado Decl. ¶¶ 4–5. The agents wore bulletproof vests and were visibly armed with holstered guns and a battering ram. Tr. 20, 39, 67; Vado Decl.

---

[1] On a suppression motion, the Government bears the burden of proof by a preponderance of the evidence. *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010).

¶ 5. Thompson and Spivack both testified, credibly, that neither they nor any other agent they saw drew a gun at the time the door was opened (or at any other point). Tr. 6–7, 20–21, 55–56.[2]

Vado and his girlfriend, Heather Leisentritt, were asleep in the apartment when the agents arrived. Tr. 22, 69; Vado Decl. ¶ 4. Vado was dressed in a t-shirt and boxers, and Leisentritt was wearing a t-shirt and pajama shorts. Tr. 22–23; Vado Decl. ¶ 4. Leisentritt was directed to sit on the futon in the living room; a female agent stood near her. Tr. 23; Vado Decl. ¶ 6. Meanwhile, one or more agents, including Thompson, took Vado into the hallway and patted him down. Tr. 8, 22. After the agents completed a sweep of the apartment, Vado was escorted to one of the apartment's two bedrooms. Tr. 9, 23, 69–70; Vado Decl. ¶ 7.

Both Thompson and Spivack testified that, upon entering a home to execute a search warrant, their practice is to promptly inform suspects that they are not under arrest and are free to leave. Tr. 5, 39, 51. Both agents testified that Vado was so informed at least once: Thompson testified that he made such statement to Vado in the hallway at the outset of the search and again at the outset of Vado's interview, Tr. 10, 39–40; and Spivack testified that Thompson made such statement at the outset of the interview, Tr. 58. The agents' joint 302 form, prepared two days after the interview, is consistent with the agents' testimony: It states that, before the agents questioned Vado, he "was advised that he was not under arrest and that he was free to leave any time." Dkt. 25, Ex. C. Vado's written declaration is silent as to whether he was told that he was

---

[2] Vado's written declaration attested to the contrary—that Thompson, Spivack, and other agents had "their guns out when they entered the apartment." Vado Decl. ¶ 5. Because the Court found the agents' testimony credible on this point, and because Vado's claim was not subject to cross-examination, the Court credits the agents' account. *See, e.g., United States v. Calix*, No. 13 Cr. 582 (RPP), 2014 WL 2084098, at *1 n.1 (S.D.N.Y. May 13, 2014) (citing, *inter alia, United States v. Rodriguez*, 368 F. App'x 178, 180 (2d Cir. 2010) (summary order)); *United States v. Medina*, 19 F. Supp. 3d 518, 535 n.13 (S.D.N.Y. 2014) (collecting cases).

not under arrest. However, Vado denied ever being told "that [he] was free to leave the bedroom or the apartment." Vado Decl. ¶ 10.

The Court gave close attention to this important point. It found both agents' testimony on this point credible. The Court finds that Vado was explicitly notified, shortly after the agents arrived, and in any event before the interview commenced, that he was not under arrest and was free to leave. *See also* note 2, *supra*.

Present in the bedroom for the interview were Vado and Special Agents Thompson and Spivack. Tr. 9, 56; Vado Decl. ¶ 9. Vado sat on the edge of the bed; Thompson sat on a chair in between Vado and the door, which was partly or mostly closed; and Spivack sat on a chair off to the side. Tr. 9–10, 24, 57; Vado Decl. ¶¶ 9–10. Vado could not communicate with Leisentritt during the interview and did not have access to his cell phone. Tr. 34–35; Vado Decl. ¶ 7.

It is undisputed that Vado was interviewed by the agents while in the bedroom. The three persons present, however, each recounted differently the events that occurred immediately before the commencement of substantive questioning, with the two agents' testimony being relatively synchronous and Vado's farther afield.

*Vado*: In his written declaration, Vado stated that Thompson began by informing him that "he and Spivack were investigating people who commit crimes on the Internet involving child pornography and people who hurt children. Thompson asked [Vado] if [he] knew anything about that or knew anyone involved in that. [Thompson] said that if [Vado] did, now was the time to talk to them about it and help them out." Vado Decl. ¶ 11. Thompson told Vado that he "seemed like a smart guy" who "understood [his] rights, so [Thompson] didn't need to go through them." *Id.* ¶ 12. Vado told the agents that he thought he wanted a lawyer, and then that he wanted a lawyer. *Id.* The agents left the room for a few minutes to discuss his request. *Id.*

4

¶¶ 12–13. When they returned, "Thompson said if [he] wanted to tell [his] side of the story, now was the time." *Id.* ¶ 13. The agents also told him that if he wanted a lawyer, he "wouldn't be able to tell [his] side of the story" and "would have to stay in the bedroom until they were finished searching the apartment." *Id.* At that point, one of the agents gave Vado the Advice of Rights form and told him to sign it. *Id.* ¶ 14. Vado complied and began answering the agents' questions. *Id.*

*Agent Thompson*: Thompson testified that he told Vado that he was not under arrest and was free to leave. Tr. 10. He then explained the purpose of the search and the investigation, namely, to identify persons making child pornography videos. Tr. 10–11. After reading Vado his *Miranda* rights, he handed Vado an Advice of Rights Form. Tr. 11–12. Vado said "I think I need a lawyer," and Thompson responded, "that's your choice." Tr. 12–13. Vado then asked a question or made a statement about the case, implying that he wanted to talk to the agents after all. Tr. 13–14. At Spivack's request, the two agents left the room and went into the hallway to discuss the issue; they concluded that Vado had invoked his right to counsel, precluding further questioning of him. Tr. 14–15. When the agents reentered the bedroom about 30 seconds later, Thompson advised Vado that they could no longer discuss the case or ask each other questions about the case. Tr. 15. However, he told Vado that if he wanted to talk—*i.e.*, if Vado changed his mind—he could do so, and would remain entitled to stop answering questions at any time. Tr. 15–16. Vado responded that he would talk to the agents as long as he could stop whenever he wanted. Tr. 17. Thompson asked Vado to read the Advice of Rights form aloud, which he did. Tr. 17. Vado then signed the form, and the agents began the interview. Tr. 17–18.

*Agent Spivack*: Like Thompson, Spivack testified that Thompson told Vado that he was not under arrest and was free to leave, read Vado his *Miranda* rights, and handed him the Advice

of Rights Form, at which point Vado said that he wanted a lawyer. Tr. 58–60. After Vado invoked his right to counsel, Thompson made a brief comment about the purpose of the search and the evidence the FBI already had against Vado. Tr. 60. Vado then said that he would talk to the agents as long as he could decline to answer certain questions. Tr. 61. Spivack asked to speak with Thompson outside the bedroom to ensure that the agents were "on the same page" as to whether Vado had invoked his *Miranda* rights. Tr. 61–62, 76. After conferring for 30 to 40 seconds, the agents reentered the bedroom. Tr. 62. Thompson told Vado that, because he had invoked his right to counsel, the agents could not talk to him. Tr. 63. Thompson stated that if Vado wanted to talk to the agents, that decision was his to make, and was "completely voluntary" and "completely on him." Tr. 63, 75–76. Vado responded that he wanted to talk but would only answer certain questions. Tr. 63. Vado signed the Advice of Rights form, and the interview commenced. Tr. 63–65.

Having carefully observed the agents' testimony and considered these three accounts, the Court finds the following facts.

First, as both agents testified, Thompson told Vado that he was not under arrest and that he was free to leave before he asked Vado any questions. Tr. 10, 39–40, 58. Second, the agents read Vado his *Miranda* rights and handed Vado the Advice of Rights Form, which Vado read aloud. Tr. 11–12, 58–60. Third, Vado then stated that he thought he needed a lawyer and that he wanted a lawyer. Tr. 12–13, 58–60; Vado Decl. ¶ 12. Fourth, the agents briefly left the room to discuss Vado's invocation of his right to counsel. Tr. 14–15, 61–62, 76; Vado Decl. ¶ 12. Fifth, when the agents reentered the bedroom, the agents informed Vado that they could not initiate questioning of him, but Vado stated that he agreed to talk to the agents as long as he could stop

6

answering questions at any time. Tr. 17, 61; Vado Decl. ¶¶ 13–14.[3] Sixth, Vado then signed the Advice of Rights form at 6:13 a.m., following which the substance of the interview commenced. Tr. 17–18, 58–60; Vado Decl. ¶ 14.

Special Agents Thompson and Spivack proceeded to question Vado for approximately 40 minutes, until 6:52 a.m. Dkt. 25, Ex. C. The agents terminated their questioning when, in response to a question, Vado repeated his request for a lawyer. Tr. 18, 65; Vado Decl. ¶ 14. Thompson and Spivack then went to the kitchen, where other agents and forensics experts were examining Vado's cell phone and computers. Tr. 34, 77. Vado was taken to the apartment's second bedroom, where another agent stood guard either in the room or near the door. Tr. 34, 77–78; Vado Decl. ¶ 14. About one hour after the interview ended, Vado was arrested and taken from the apartment in handcuffs. Tr. 18, 65; Vado Decl. ¶ 15.

During the interview, Vado made various incriminating statements, including that he had engaged in sexually explicit chats and exchanged sexually explicit photographs with a minor through an Internet application called Kik. Vado Decl. ¶ 14. Vado also stated that he had used certain screen names and Internet accounts on Kik and other platforms. *Id.* These are among the statements that Vado now seeks to suppress.

---

[3] The Court also finds that, at some point between when Vado invoked his right to counsel but before Vado agreed to speak with the agents, Thompson made some brief statement to Vado. All three persons present recalled such a statement, although their recollections differed as to its substance. Spivack testified that Thompson referred to the evidence that the agents had developed in the case, Tr. 60; Vado attested that Thompson said that if Vado wanted to tell his side of the story, "now was the time," Vado Decl. ¶ 13; and Thompson testified that he informed Vado that, while the agents could not lawfully initiate questioning of Vado given his invocation of his right to counsel, Vado could change his mind and initiate an interview, Tr. 15–16. It is not necessary for the Court to resolve specifically what Thompson said, given the finding that Vado was not in custody at the time. Had the Court found that Vado was in custody, however, it would have been necessary for the Court to determine whether Thompson's statement had the effect of restarting the interrogation or otherwise prompting Vado to make inculpatory statements. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

## II. Discussion

### A. Applicable Legal Standards

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), a suspect in custody must receive certain warnings before he can be subjected to interrogation. *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010). Determining whether a suspect was "in custody" for *Miranda* purposes requires a two-part inquiry: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *J.D.B. v. N. Carolina*, 131 S. Ct. 2394, 2402 (2011) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "[I]n the absence of actual arrest, something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969).

If a suspect is in custody, "police officers must warn [the] suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney." *Maryland v. Shatzer*, 559 U.S. 98, 103–04 (2010). Statements elicited from a defendant during a custodial interrogation are inadmissible unless the defendant has waived his *Miranda* rights. *Id.* at 104. A valid waiver must be knowing, meaning that it was "'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Berghuis*, 560 U.S. at 382–83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The

waiver must also be voluntary, meaning that "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* at 382 (quoting *Moran*, 475 U.S. at 421).

"After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present." *Shatzer*, 559 U.S. at 104 (citations omitted). The Supreme Court has addressed, in *Edwards v. Arizona*, 451 U.S. 477 (1981), the circumstance in which a suspect has previously requested counsel but is claimed to have afterwards waived his *Miranda* rights. The Court held there that the police may not further interrogate the suspect until counsel has been made available, unless the accused himself initiates further discussions with the police and waives the right that he had invoked. *Edwards*, 451 U.S. at 484–85.

The government bears the burden of establishing a valid waiver and voluntary confession by a preponderance of the evidence. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (citing *Colorado v. Connelly*, 479 U.S. 157, 169 (1986); *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

### B.     Analysis

#### 1.     Whether Vado was in Custody

The critical question before the Court is whether Vado was "in custody" for *Miranda* purposes when the agents questioned him on June 17, 2014. If not, Vado's *Miranda* rights were not, as a matter of law, implicated by the agents' questioning. *See Oregon v. Mathiason*, 429 U.S. 492, 494–95 (1977).

Among the factors relevant to the custody inquiry are "the interrogation's duration; its location . . . ; whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether

9

officers told the suspect he was free to leave or under suspicion." *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011). Here, the location of the interrogation is significant because, "absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." *United States v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004). Only in extreme or unusual circumstances have courts held that suspects interrogated in their homes were restricted to a degree comparable to that of an individual placed under formal arrest. *See, e.g., Orozco v. Texas*, 394 U.S. 324, 327 (1969) (officer testified that suspect "was under arrest and not free to leave when he was questioned in his bedroom"); *Newton*, 369 F.3d at 677 (suspect was handcuffed); *United States v. Romaszko*, 253 F.3d 757, 759 (2d Cir. 2001) (suspect "asked to leave or attempted to stand up" at least five times "and was told that she could not").[4]

The interrogation of Vado in the familiar surroundings of his bedroom, by contrast, was routine. Before commencing the interview, the two agents explicitly informed Vado him that he was not under arrest and was free to leave. Tr. 10, 39–40, 58. *See United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) (finding such statements by government agents to the person interviewed particularly important in resolving whether a reasonable person would have understood that he was not in custody). During the interview, which lasted no more than 40 minutes, Vado was not restrained, and the agents' weapons were not drawn. Tr. 6–7, 10, 20–21,

---

[4] The out-of-circuit cases Vado cites that found a suspect questioned in his home to have been in custody likewise involve circumstances far afield from those here. *See United States v. Craighead*, 539 F.3d 1073, 1085 (9th Cir. 2008) (suspect confronted by officers from "three different law enforcement agencies" and did not understand "whether the agencies were acting in coordination"); *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (suspect "confronted with an unholstered gun in his darkened bedroom" and interrogated for at least 90 minutes); *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) (suspect "restrained in handcuffs, and placed face down on the floor"); *Sprosty v. Buchler*, 79 F.3d 635, 642 (7th Cir. 1996) (officers surrounded suspect and blocked him from leaving); *United States v. Griffin*, 922 F.2d 1343, 1354 (8th Cir. 1990) (suspect "not informed that he was not under arrest, that he was at liberty to request the agents to leave, or that he could refuse to answer questions").

55–56, 58; Vado Decl. ¶¶ 9–15. Vado never asked to leave the bedroom or the apartment, and the agents promptly terminated the interview when Vado indicated that he no longer wished to answer their questions. Tr. 18, 65; Vado. Decl. ¶ 14.

Viewed in combination, these circumstances do not approximate a restraint on freedom of movement of the degree associated with formal arrest. *See United States v. Akapo*, 420 F. App'x 42, 44 (2d Cir. 2011) (summary order) (suspect not in custody where he was not handcuffed, did not indicate that he wanted to leave, and was not told that he could not leave); *United States v. Cerreta*, 63 F. App'x 585, 587 (2d Cir. 2003) (summary order) (suspect not in custody where he "was informed that he did not have to answer questions, that he was not under arrest, and that he could leave if he wanted to"; "there was no evidence that defendant sought and was unable to leave prior to the end of the interrogation"; and "the amount of time involved was not excessive").

In arguing that he was in custody, Vado emphasizes that there were numerous agents in his apartment and that the agents exercised their authority in various ways, both in connection with executing the search warrant and in conducting the interview. Specifically, an agent, at one point with his arm on Vado's shoulder, moved Vado from room to room while the search was underway, Tr. 8–9, 43, 47; agents moved Vado to the bedroom and away from his girlfriend to conduct the interview, Tr. 9, 23, 69–70; and during the interview, at least one agent was situated between Vado and the partially closed bedroom door, Tr. 9–10, 24, 57.

These discrete facts, while individually tending to favoring Vado's claim, do not disturb the Court's overall conclusion that Vado was not in custody. As the Second Circuit has noted, "'[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it.'" *Newton*, 369 F.3d at 671 (quoting *California v. Beheler*, 463 U.S. 1121, 1124 (1983)

(alteration in original)). And "*Miranda* does not reach so broadly" as to attach any time an interview has some coercive quality. *Id.* As to particular factors, the Second Circuit has held that the number of agents present for an interview, while relevant, is far from dispositive as to custody, *id.* at 675; the same is true for the separation of the suspect (Vado) from a companion (Leisentritt) and his isolation during an interview, *see Cerreta*, 63 F. App'x at 587. In this case, the factors upon which Vado seizes must also be considered in the context of an interview conducted during the execution of a search warrant—a fact of which Vado was well aware. The number of agents, and the agents' actions in guiding Vado from room to room, had the obvious benign purpose of enabling the agents to safely and efficiently complete the search, as opposed to being undertaken to intimidate or coerce Vado. *Compare Badmus*, 325 F.3d at 136 (defendant not in custody where at least five agents, for "security reasons," carried weapons and limited defendant's movement while executing a search warrant), *with Sprosty*, 79 F.3d at 642 (defendant in custody where "as the search progressed, it became increasingly apparent that [the agent's] role at the mobile home was to guard [defendant], not to execute the search warrant").

Considering the totality of the circumstances—in particular, that Vado was interviewed at home, was not restrained, was explicitly told that he was free to leave, and was interviewed for only a modest length of time—the Court finds that Vado was not in custody. *See FNU LNU*, 653 F.3d at 153, 155.

### 2. Whether the Agents Violated Vado's Right to Counsel

The parties agree that Vado unambiguously invoked his right to counsel. *See, e.g.*, Tr. 81; Vado Decl. ¶ 12. They vigorously dispute, however, whether it was Vado, or a comment by Thompson after Vado's invocation that Vado claims was tantamount to interrogation, that reinitiated the parties' communications, including his substantive interrogation. *See* note 4,

*supra.* The Court has no occasion to resolve that factual dispute: Because Vado was not in custody for *Miranda* purposes, his Fifth Amendment right to counsel had not attached, and the agents were not required to obtain a waiver of rights before questioning him. *See, e.g., Mathiason*, 429 U.S. at 494–95; *Newton*, 369 F.3d at 669 (collecting cases); *United States v. Wilson*, 914 F. Supp. 2d 550, 559 (S.D.N.Y. 2012) ("It is well-settled that *Miranda* rights attach at the moment a suspect is placed in custody.").

### 3. Whether Vado's Statements Were Voluntary

As an alternative to his claim that the agents violated his *Miranda* rights, Vado argues that his statements were involuntary. Vado Br. 14. He bases this claim on two factual allegations—both disputed by the agents. Specifically, he claims, the agents told him, before he was interrogated, that if he maintained his request for counsel and declined to answer questions, he: (1) would not be able to tell his side of the story, and (2) would have to remain in the bedroom while the agents completed the search. Vado Decl. ¶ 13. Vado argues that these representations were false and induced his inculpatory statements. Vado Br. 14–15.

A statement is involuntary if it is the product of "intimidation, coercion, or deception." *Berghuis*, 560 U.S. at 382. "'[T]the test of voluntariness [of a confession] is whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *United States v. Mast*, 735 F.2d 745, 749 (2d Cir. 1984) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). "Circumstances that support a finding of involuntariness may include 'the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of

13

food or sleep.'" *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

For two reasons, the Court rejects Vado's claim that his statements were involuntary. First, the Court does not find that the two challenged statements were made. The only witnesses to testify at the suppression hearing, Special Agents Thompson and Spivack, emphatically—and in the Court's view, credibly—denied that Vado was told that if he did not answer the agents' questions, he would never be able to tell his side of the story, or would have to remain in the bedroom. Tr. 17, 19, 33–34, 60–61, 64, 66. The only support for the claim that these statements were made is Vado's sworn declaration. But because Vado declined to testify and subject himself to cross-examination, that declaration merits less weight. *See* note 2, *supra*. As to this point, the Court declines to credit Vado's declaration and credits instead the agents' denials.

Second, because the interrogation was noncustodial, such statements, even if they had been made, would not support a finding of involuntariness. Had Vado's interrogation been custodial, his version of events conceivably could have supported such a finding. *See United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991) (collecting cases holding that "affirmative misrepresentations by the police may be sufficiently coercive to invalidate a suspect's waiver of the Fifth Amendment privilege"). But statements made during noncustodial interrogations can be deemed involuntary only in "special circumstances." *Beckwith v. United States*, 425 U.S. 341, 347–48 (1976). Here, there are no such circumstances.

The Second Circuit's decision in *United States v. Mast*, 735 F.2d 745 (2d Cir. 1984), is instructive on this point. In *Mast*, the Circuit addressed whether an agent's statement during a non-custodial interrogation that the defendant "did not need an attorney and that it would do no harm to sign the waiver of rights form" rendered defendant's ensuing inculpatory statements

14

involuntary. *Id.* at 749. The Court held that this statement did not unlawfully mislead the defendant because he was not in custody and therefore did not have a constitutional right to have an attorney present. *Id.* at 749 n.4. Additionally, the impact of the allegedly misleading statement was offset by other statements the agents made, specifically, in reciting the *Miranda* warnings, asking Mast to sign an Advice of Rights Form, and informing the defendant that he had "a right to stop talking and consult an attorney at any time." *Id.* at 570 The Court concluded that the agents' statements "taken alone or in combination with the promise not to prosecute did not overbear [defendant's] will and 'bring about [statements] not freely self-determined.'" *Id.* at 751 (quoting *Beckwith*, 425 U.S. at 348) (second alteration in original).

The facts here are fairly analogous. The agents' purported threats, as recounted by Vado, pertained to Vado's request for counsel, but his right to counsel under the Fifth Amendment had not yet attached. And the false statements the agents assertedly made were offset by the agents' statements that Vado was not under arrest and was free to leave or to decline to answer questions, and by the process of reciting the *Miranda* warnings and giving Vado an Advice of Rights form to review and sign. Thus, even assuming *arguendo* that the agents had told Vado that he would not be able to tell his side of the story and would have to remain in the bedroom if he declined to talk, those statements do not constitute "special circumstances" that would have overcome Vado's will to resist. *Cf. Guarno*, 819 F.2d at 31 (in context of a non-custodial interrogation, agents' statement that "they will withdraw the offer of leniency if the suspect consults a lawyer" did not render defendant's confession involuntary).

## CONCLUSION

For the foregoing reasons, Vado's motion to suppress is denied. The Clerk of Court is directed to terminate the motion pending at docket number 24.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: January 20, 2015
      New York, New York